Joseph P. Loughlin
Law Offices of M.L. Zager, P.C.
461 Broadway, PO Box 948
Monticello NY 12701
jloughlin@mzager.com
Fax: 845-794-3919
Tel: 845-794-3660

Attorneys for Plaintiff
G & G Closed Circuit Events, LLC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| G & G Closed Circuit Events, LLC | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| David Colon individually and d/b/a Escape Latino Restaurant; Santos Dalmau, individually and d/b/a Escape Latino Restaurant; and Escape Latino Corp., an unknown business entity d/b/a Escape Latino Restaurant | |
| Defendants. | |

**PLAINTIFF ALLEGES:**

## <u>JURISDICTION</u>

1. Jurisdiction is founded on the existence of a question arising under particular statutes. This action is brought pursuant to several federal statutes, including the Communications Act of 1934, as amended, Title 47 U.S.C. 605, *et seq.*, and The Cable & Television Consumer Protection and Competition Act of 1992, as amended, Title 47 U.S. Section 553, *et seq.*

2. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. Section 1331, which states that the District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties, of the United States.

3. This Court has personal jurisdiction over the parties in this action as a result of the Defendants' wrongful acts hereinafter complained of which violated the Plaintiff's rights as the exclusive commercial domestic distributor of the televised fight *Program* hereinafter set forth at length. The Defendants' wrongful acts consisted of the interception, reception, publication, divulgence, display, and exhibition of said property of Plaintiff within the control of the Plaintiff in the State of New York.

## VENUE AND INTRADISTRICT ASSIGNMENT

4. Venue in this Court is proper under 28 U.S.C. §1391 as a substantial part of the Programs or omissions giving rise to the claims herein occurred in this District.

5. Assignment to the Southern District of New York is proper because a substantial part of the Programs or omissions giving rise to the claim occurred in Westchester County and/or the United States District Court for the Southern District of New York has decided that suits of this nature, and each of them, are to be heard by the Courts in this particular Division.

## THE PARTIES

6. Plaintiff, G & G Closed Circuit Events, LLC is, and at all relevant times hereto was, a California corporation with its principal place of business located at 2925 Green Valley Parkway, Suite D, Henderson, NV 89014.

7. Escape Latino Corp., an unknown business entity d/b/a Escape Latino Restaurant (hereinafter "Escape Latino Corp."), at all times relevant hereto, was a Domestic Business Corporation organized and existing under the laws of the State of New York.

8. At all times relevant hereto, Escape Latino Corp. was an owner, and/or operator, and/or licensee, and/or permittee, and/or person in charge, and/or an entity with dominion, control, oversight and management of the commercial establishment doing business as Escape Latino

Restaurant operating at 969 Main Street New Rochelle NY 10801.

9. At all times relevant hereto, Defendants David Colon and Santos Dalmau were identified as Owners and Principals of Escape Latino Corp., which owned and operated the commercial establishment doing business as Escape Latino Restaurant operating at 969 Main Street New Rochelle NY 10801.

10. At all times relevant hereto, Defendants David Colon and Santos Dalmau  were identified by the New York State Liquor Authority as the Principals for Escape Latino Corp. on the New York State Liquor Authority License for Escape Latino Corp. (License Serial No. 1297795), for the commercial establishment Escape Latino Corp. operating at 969 Main Street New Rochelle NY 10801.

11. At all times relevant hereto, Defendants David Colon and Santos Dalmau were the sole individuals identified on the On Premises Liquor License (License Serial No. 1297795) issued to Escape Latino Corp. for the commercial establishment Escape Latino Restaurant operating at 969 Main Street New Rochelle NY 10801.

12. Plaintiff is informed and believes, and alleges thereon that on Saturday, September 16, 2017 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19) Defendants David Colon and Santos Dalmau , as the Owners and Principals of Escape Latino Corp., and as the sole individuals identified on the On Premises Liquor License (License Serial No. 1297795)  for Escape Latino Corp. had the right and ability to supervise the activities of Escape Latino Restaurant, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

13. Plaintiff is informed and believes, and alleges thereon that on Saturday, September 16, 2017 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19)

Defendants David Colon and Santos Dalmau as the Owners and Principals of Escape Latino Corp. and as the sole individuals identified on the On Premises Liquor License (License Serial No. 1297795) for Escape Latino Corp. had the obligation to supervise the activities of Escape Latino Restaurant operating at 969 Main Street New Rochelle NY 10801, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

14. Plaintiff is informed and believes, and alleges thereon that on Saturday, September 16, 2017 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendants David Colon and Santos Dalmau specifically directed the employees of Escape Latino Restaurant to unlawfully intercept, receive and broadcast Plaintiff's *Program* at Escape Latino Restaurant or intentionally intercepted, and/or published the *Program* at Escape Latino Restaurant himself. The actions of the employees of Escape Latino Restaurant are imputable to Defendants David Colon and Santos Dalmau by virtue of their acknowledged responsibility for the operation of Escape Latino Restaurant.

15. Plaintiff is informed and believes, and alleges thereon that on Saturday, September 16, 2017 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendants David Colon and Santos Dalmau as the Owners and Principals of Escape Latino Corp. and as the sole individuals identified on the On Premises Liquor License (License Serial No. 1297795) for Escape Latino Corp. , had an obvious and direct financial interest in the activities of Escape Latino Restaurant operating at 969 Main Street New Rochelle NY 10801, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

16. Plaintiff is informed and believes, and alleges thereon that the unlawful interception, receipt and publication of Plaintiff's *Program*, as supervised and/or authorized by Defendants David Colon and Santos Dalmau, resulted in increased profits or financial benefit to Escape Latino

Restaurant.

17. Plaintiff is informed and believes, and alleges thereon that on Saturday, September 16, 2017   (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendants David Colon and Santos Dalmau  as the Owner and Principal of Escape Latino Corp. was a moving and active conscious force behind the operation, advertising and promotion of Escape Latino Restaurant operating at 969 Main Street New Rochelle NY 10801, and is responsible for all activities that occurred therein, which included the unlawful interception and exhibition of Plaintiff's *Program*.

## Factual Background

18. Plaintiff G & G Closed Circuit Events, LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-17, inclusive, as though set forth herein at length.

19. Plaintiff entered into a license agreement with Golden Boy Promotions LLC through which Plaintiff was granted the exclusive nationwide commercial distribution (closed-circuit) rights to Gennady Golovkin v Saul Alvarez, IBF World Middleweight Championship Fight *Program*, telecast nationwide on Saturday, September 16, 2017, including undercard or preliminary bouts (the match and all related bouts are collectively referred to as the "*Program*"), at commercial establishments such as theaters, arenas, bars, clubs, lounges, restaurants and the like throughout New York and other geographic locales (the "License Agreement"). A copy of the License Agreement is annexed hereto as **Exhibit A**. Plaintiff paid substantial fees for its exclusive rights to exhibit the Program under the License Agreement.

20. Pursuant to the terms of the License Agreement, Plaintiff G & G Closed Circuit Events, LLC, entered into subsequent sublicensing agreements with various commercial entities throughout North America, including entities within the State of New York, by which it granted these entities

limited sublicensing rights, specifically the rights to publicly exhibit the Program within their respective commercial establishments.

21. The Program could only be exhibited in a commercial establishment in New York if said establishment was contractually authorized to do so by Plaintiff G & G Closed Circuit Events, LLC.

22. Pursuant to the License Agreement, G & G Closed Circuit Events, LLC marketed and distributed the closed-circuit rights granted to it. G & G Closed Circuit Events, LLC contracted with various establishments throughout New York and granted to such establishments the right to broadcast the Program in exchange for a fee.

23. As a commercial distributor and licensor of sporting Programs, including the *Program*, Plaintiff G & G Closed Circuit Events, LLC, expended substantial monies marketing, advertising, promoting, administering, and transmitting the *Program* to its commercial customers.

24. The transmission of the *Program* was electronically coded or "scrambled". In order for the signal to be received and telecast clearly, it had to be decoded with electronic decoding equipment. The *Program* originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal.

25. If a commercial establishment was authorized by Plaintiff to receive the *Program*, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's satellite or cable provider would be notified to unscramble the reception of the *Program* for the establishment, depending upon the establishment's equipment and provider.

26. On Saturday, September 16, 2017 (the night of the Program at issue herein, as more specifically defined in paragraph 19), Escape Latino Restaurant broadcast the Program on two (2) screens with approximately 15-30 people in attendance.

27. On information and belief, on Saturday, September 16, 2017 (the night of the Program at issue herein, as more specifically defined in paragraph 19), Escape Latino Restaurant sold alcoholic and non-alcoholic beverages to its patrons

28. The commercial fee for an establishment the size of Escape Latino Restaurant to broadcast the Program lawfully was $2,500.00. Neither Defendants David Colon, Santos Dalmau nor Escape Latino Corp. paid such a fee to Plaintiff.

<u>COUNT I</u>

**(Violation of Title 47 U.S.C. Section 605)**

29. Plaintiff G & G Closed Circuit Events, LLC, hereby incorporates by reference all of the allegations contained in paragraphs 1-28, inclusive, as though set forth herein at length.

30. On Saturday, September 16, 2017 in violation of G & G Closed Circuit Events, LLC's rights and federal law, Defendants intercepted and/or received the satellite communication of the Program at Escape Latino Restaurant. Defendant also divulged and published said communication, or assisted in divulging and publishing said communication to patrons within Escape Latino Restaurant.

31. The *Program* was broadcast at Escape Latino Restaurant without the authorization or approval of Plaintiff.

32. With full knowledge that the *Program* was not to be intercepted, received, published, and/or exhibited by commercial entities unauthorized to do so, the above named Defendants, either through direct action or through actions of employees or agents directly imputable to Defendants (as outlined in paragraphs 7-17 above), did unlawfully intercept, receive, publish, and/or exhibit the *Program* at the time of its transmission at her commercial establishment Escape Latino Restaurant, operating at 969 Main Street New Rochelle NY 10801.

33. Said unauthorized interception, reception, publication, and/or exhibition by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, *inter alia*, the broadcasting of the *Program* on one projection screen and one televisions screens, and the sale of alcoholic beverages during the broadcast.

34. Title 47 U.S.C. § 605(a), and in particular the second through fourth sentences thereof, prohibits the unauthorized interception, receipt, publication and use of radio communications (which include satellite signals) such as the transmission of the Program for which Plaintiff G & G Closed Circuit Events, LLC, had the distribution rights thereto.

35. By reason of the aforesaid mentioned conduct, the aforementioned Defendants, violated Title 47 U.S.C. § 605(a).

36. By reason of the Defendants' violation of Title 47 U.S.C. § 605(a), Plaintiff G & G Closed Circuit Events, LLC, has the private right of action pursuant to Title 47 U.S.C. § 605.

37. As the result of the aforementioned Defendants' violation of Title 47 U.S.C. § 605(a), and pursuant to said Section 605, Plaintiff G & G Closed Circuit Events, LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation of in an amount to $10,000 pursuant to Title 47 U.S.C. Section 605(e)(3)(C)(i)(II);

(b) Statutory damages for each willful violation in an amount to $100,000.00 pursuant to Title 47 U.S.C. § 605(e)(3)(C)(ii); and

(c) The recovery of full costs, including reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 605(e)(3)(B)(iii).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

## COUNT II

### (Violation of Title 47 U.S.C. Section 553)

38. Plaintiff G & G Closed Circuit Events, LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-37, inclusive, as though set forth herein at length.

39. Title 47 U.S.C. § 553(a) prohibits the unauthorized interception or receipt of programming such as Plaintiff's over a cable system.

40. Upon information and belief, and as an alternative to Count I, on Saturday, September 16, 2017 in violation of G & G Closed Circuit Events, LLC's rights and federal law, Defendants willfully intercepted and/or received the original communication of the *Program* at Escape Latino Restaurant via a cable system.

41. Said unauthorized interception and reception by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, inter alia, the broadcasting of the *Program* on two (2) screens, and the sale of alcoholic and non- alcoholic beverages during the broadcast.

42. The unauthorized interception or reception of the Program by the Defendants was prohibited by Title 47 U.S.C. § 553(a).

43. By reason of the aforesaid mentioned conduct, the Defendants violated Title 47 U.S.C. § 553(a).

44. By reason of the Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events, LLC, has the private right of action pursuant to Title 47 U.S.C. § 553.

45. As the result of Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events, LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation in an amount to $10,000.00 pursuant to Title 47

U.S.C. § 553(c)(3)(A)(ii);

(b) Statutory damages for each willful violation in an amount to $50,000.00 pursuant to Title 47 U.S.C. § 553(c)(3)(B);

(c) The recovery of full costs pursuant to Title 47 U.S.C. Section 553 (c)(2)(C); and

(d) In the discretion of this Honorable Court, reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 553 (c)(2)(C).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

**As to the First Count:**

1. For statutory damages in the amount of $110,000.00 against the Defendants;

2. For reasonable attorneys' fees as mandated by statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

**As to the Second Count:**

1. For statutory damages in the amount of $60,000.00 against the Defendants;

2. For reasonable attorneys' fees as may be awarded in the Court's discretion pursuant to statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

Date: July __2__, 2020

Respectfully submitted,

LAW OFFICES OF M.L. ZAGER, P.C.
By: Joseph P. Loughlin
Attorneys for Plaintiff
G & G Closed Circuit Events, LLC

# EXHIBIT A

Golden Boy Promotions, LLC
626 Wilshire Blvd., Suite 350
Los Angeles, California 90017

May 21, 2018

VIA EMAIL
G&G Closed Circuit Events, LLC
950 S. Bascom Ave; Suite 3010
San Jose, CA 95128

Attention: Nicolas J. Gagliardi

RE:   CLOSED-CIRCUIT TELEVISION LICENSE AGREEMENT

Saul Alvarez vs. Gennady Golovkin
Scheduled 12 round WBA, IBF & IBO Middleweight Championship Bout
Plus selected undercard bouts
(Fighters subject to change)

T-Mobile Arena
Las Vegas, NV
Saturday, September 16, 2017

Gentlemen:

This will confirm the terms of our agreement whereby Golden Boy Promotions, LLC ("Promoter") hereby grants to G&G Closed Circuit Events, LLC. ("G&G" "You" or "Licensee") the exclusive license to exhibit Promoter's live simultaneous HBO-PPV telecast (the "Telecast") of the above-captioned prizefight and accompanying undercard matches (collectively defined as the "Event"), only within the Fifty States of the United States of America, the District of Columbia and Canada ( the "Territory"), only at non-residential locations; including, but not limited to, bars, clubs, lounges, restaurants and the like of a commercial (or non-commercial) nature, each with a fire code occupancy capacity **not to exceed 500 persons per outlet** (except for outlets within casinos where the seating capacity may exceed 500 persons per outlet), located within the Territory. The Exhibition rights granted herein **do not include** any rights to exhibit the Event in the Commonwealth of Puerto Rico, Mexico, transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities, nor does it include the right to sublicense the Event other than the HBO-PPV telecast! Any proposed closed circuit sublicensing of exhibition of the Event at arenas, racetracks or theaters (if Promoter does not execute the Fathom Agreement as defined below) shall be subject to the prior written approval of Promoter, which approval may be granted or refused in the discretion of Promoter.

1

1.     **License Fee.** As full and complete compensation for the rights granted to Licensee by Promoter, you shall pay to Promoter the license fee calculated as follows:

      a.    Licensee shall pay the Minimum Financial Guarantee of ████████ ████████████████████ Dollars (the "Minimum Financial Guarantee"), pursuant to the provisions of paragraph 2;

      Then, the amount of all gross revenues in excess of the first ████████ █████████ Dollars (which threshold amount Licensee shall retain in recoupment of the Minimum Financial Guarantee) which Licensee receives from all closed circuit television exhibitions of the Event in the Territory shall be payable as follows:

          I.    Deduct Marketing and credit card costs up to ████████ of revenue;

          II.   Deduct Sales commission up to ███████;

          III.  The remaining revenue balance shall be split ████ to GBP and ████ to G&G

      b.    For avoidance of doubt, if Promoter executed the Fathom Agreement (as defined below), then Licensee shall not license any theaters in the Territory and License Fees shall expressly exclude any and all revenues and monies derived from or relating to the sale, license or other exploitation of the rights granted to Fathom pursuant to the Fathom Agreement.

      c.    All amounts which are to be deducted or withheld by your sublicense exhibitors, sales agents or distributors from payments to you or your sublicensees shall be subject to the mutual agreement of Promoter and Licensee but shall not exceed ████ percent of gross revenues (excluding authorization fees) from each outlet from exhibition of the Event.

      d.    In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

      e.    You shall provide the services of a duty authorized representative of your organization who shall be present at each licensed and sublicensed outlet immediately prior to and during the telecast of the Event, to monitor compliance with the terms of this Agreement and report on attendance figures and the collection of admission fees.

      f.    You shall be entitled to deduct and withhold, for advertising and publicity purposes, up to ████████████ of gross revenues from exhibition locations which you license directly to operators, other than Licensee or its affiliates, without any commission or distribution fee to third party sales agents or distributors.

2

       g.      Licensee shall be responsible for all of its local advertising material, such as posters, press kits and slide, including the option to use Event posters to be supplied by HBO-PPV. All advertising materials shall be subject to Promoter's prior written approval.

       h.      The calculation of gross revenues shall not include the amount of any fees or taxes referenced in this Agreement paid or required to be paid hereunder.

       i.      Licensee acknowledges that Promoter intends to enter into an agreement with Fathom for the sale, license or other exploitation of the rights of the Event and its exhibition in movie theaters.

       j.      Licensee agrees to authorize the exhibition of the Event in Las Vegas casino locations at the sole direction of Promoter. For avoidance of doubt, License Fees shall expressly exclude any and all revenues and monies derived from or relating to the sale or license of the exhibition of the Event at casino locations in Las Vegas.

    2.    **Minimum Financial Guarantee and License Fees Overage Payments.**

       a.      As minimum guarantee and non-refundable advance against the License Fee due to Promoter pursuant to Paragraph 1 of this Agreement for the Event, you shall pay to Promoter the sum of ████████████████████████ ████████████ Dollars, not later than ten (10) business days prior to the Event; and

       b.      The Minimum Financial Guarantee amount shall be paid by:

          I.      a certified check or bank cashier's check payable to "Golden Boy Promotions, LLC" in such amount; or

          II.      bank wire delivered to:

                  Name of Bank
                  Bank Street Address
                  City, State, Zip Code
                  Att.:
                  Bank Routing Number
                  Account No.
                  (to be provided by Promoter)

       c.      Payment of all license fee amounts in excess of the applicable Minimum Financial Guarantee for the Event shall be due and payable to Promoter not later than ten (10) business days after the Event.

    3.    **Equipment & Signal Transmission of the Telecast of Event.** You and your sublicensees shall be responsible to obtain, at your or their cost and expenses, either:

       a.      Authorization to receive the telecast of the Event through the services of one or more satellite ("DDS") programming providers such as DirecTV or DISH Network, to be selected by you and approved by Promoter in writing in advance; or

      b.    Authorization to receive the telecast of the Event through the services of one or more cable programming providers to be selected by you and approved by Promoter in writing in advance; or

      c.    Authorization to receive the telecast of the Event through the services of one or more alternate programming providers (such as streaming sites), to be selected by you and approved by Promoter.

      d.    You shall not charge activation or signal transmission fees to your sublicensees in excess of such fees charged to You by any programming providers delivering signal transmission of the Telecast of the Event. Any equipment charges necessary to your sublicensees to receive the Event shall be at Your cost and/or the cost of Your sublicensees.

    4.    <u>Delivery of Signal</u>

      a.    Promoter shall deliver either, as Promoter shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Event to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets or (ii) by fiber optic cable to a delivery point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets. Such delivery to the delivery point shall constitute full and complete discharge of the obligations of Promoter to you hereunder. DSS and VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders or any other such equipment for your authorized sublicensees. You shall be responsible for all charges for addressing and authorizing your sublicensees, as well as all costs and expenses necessary for the reception of the signal and for the projection at the outlets.

      b.    Promoter shall have no responsibility for your signal transmission, equipment, decoder and/or authorization fees, and Promoter shall have no responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of equipment or decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS or VUBIQUITY, and in such case, you remain responsible for payment of the License Fee to Promoter.

      c.    You shall instruct DSS and VUBIQUITY, if applicable, to provide directly to Promoter, on the first business day after the Event, their complete final sublicense reports which shall indicate the name, address, and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

    5.    <u>Pay-Per-View Exhibitions, Delayed Pay Cable Telecasts and Online Internet Transmissions.</u>

    You acknowledge the Promoter will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmission and exhibitions of the Event in the Territory on a residential pay-per-view basis, with subsequent pay cable delayed telecasts, and that; except for Anti-Piracy Enforcement as specified below, you shall have no interest or participation in such exhibitions or any other exploitation of the Event. Accordingly, Licensee has no right to record, duplicate or copy the Event by any means or to exhibit, reproduce or retransmit the Event or any portion thereof. The Telecast shall be exhibited in its entirety without alterations or changes of any nature, simultaneous with the Program.

6. **Anti-Piracy Enforcement**

You and your sublicensees shall use their reasonable best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Event. You shall promptly advise the Promoter of any piracy (i.e., unauthorized use or proposed use) of the Event in the Territory. Promoter and Licensee, acting jointly shall have the right to commence or settle any claim or litigation arising out of the alleged piracy, improper use or proposed improper use of the Event in the Territory.

a) Notwithstanding the fact that Licensee has secured the rights from Promoter to sublicense the live HBO-PPV telecast of the Event only at non-residential locations within the Territory, Promoter and Licensee agree Licensee shall have the right to identify and prosecute as may be necessary all acts of alleged piracy of the Event, regardless of which particular broadcast and/or means of transmission an alleged unlicensed exhibitor may have utilized to obtain and exhibit the Event, including but not limited to international broadcasts (i.e., SkyTV Mexico), internet streaming, and/or replay on private media. Licensee's right to prosecute piracy regarding such transmissions of the Event shall be limited exclusively to claims against non-residential exhibitors within the Territory and Sublicensee shall be subject to the additional exclusions set forth above and below regarding Private Showings and any other exclusions subsequently agreed upon by Promoter and Licensee and thereafter memorialized in writing.

b) License shall notify Promoter in writing and/or shall consult with Promoter as may be necessary or beneficial to do so before commencing or settling any such claim or litigation in the Territory. Promoter agrees that Licensee shall be afforded all necessary remedies at law or equity to protect Promoter and Licensee in the prosecution of piracy claims involving the Event. Promoter agrees Licensee may prosecute claims under any federal telecommunication statutes (i.e., Titles 47 U.S.C. §553 and §605), state statutes and common law causes of action that may be applicable and further agrees that Licensee may prosecute claims of alleged piracy under copyright causes of action (i.e., Title 17 U.S.C. §101) and Promoter shall assist Licensee as necessary to support the claims brought forth in copyright by executing the Copyright Assignment Agreement, attached hereto to this Agreement as Exhibit "A".

c) Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory, and after payment of reasonable legal fees and disbursements, shall constitute gross revenues from the Event, to be shared by, and distributed to, the Promoter and Licensee as provided in Paragraph 1 of this Agreement. Licensee shall advance all required legal fees and disbarments, subject to recoupment from any application recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Promoter.

7. **Private Showings.** Promoter shall have the right, at its cost and expense and upon written notice to You, to conduct or authorize others to conduct up to ten (10) complementary Private Showings of the telecast of the Event within the Territory, with no admission charge and no advertising or advance publicity for such private showings.

8. **Attachments.** Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

a. **Closed Circuit Television Sublicense Agreement** which you and your sublicensee shall complete and sign with respect to each closed circuit television outlet you may sublicense. YOU SHALL NOT ENTER INTO ANY SUCH AGREEMENT WITHOUT FIRST OBTAINING, PRIOR TO

THE TELECAST OF THE EVENT, THE WRITTEN CONSENT AND APPROVAL OF PROMOTER TO THE TERMS THEREOF AND WITHOUT OBTAINING THE COUNTER-SIGNATURE OF PROMOTER ON THE SUBLICENSE AGREEMENT.

        b.    Closed Circuit Television Standard Terms and Conditions which shall apply to this Agreement as well as to the Closed Circuit Television Sublicense Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

        c.    Copyright Assignment Agreement SHALL APPLY TO THIS AGREEMENT AND THE CLOSED-CIRCUIT TELEVISION SUBLICENSEE AGREEMENTS, AND IS STRICTLY LIMITED TO THE SUBJECT EVENT ONLY.

9.    **Defaults.**

        a.    Your failure to deliver the Minimum Financial Guarantee as provided in Paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this Agreement or of the annexed agreements or Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies, to cancel this Agreement with you at any time without any further liability or obligation to you to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter must (i) provide Licensee with written notice specifying such default, and (ii) if and to the extent that time reasonably permits prior to the event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

        b.    If, in violation of the provisions of this Agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of 500 persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 1, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this Agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by 50% of the face amount of the highest ticket or admission price for the Event at that outlet. You agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this Agreement.

10.    **No packing with Other Events**

    You shall not sublicense closed circuit television rights to the Event to exhibitors as part of a package which includes other boxing programs or bouts not included in this Event without the prior written consent of Promoter.

11.    **Reports, Collection and Accounting.**

        a.    You shall be responsible for collection of all monies from outlets, shall make all payments and provide all reports pursuant to Paragraph 4 of the Closed Circuit Television Standard Terms and Conditions, and shall provide Promoter with copies of all reports received from sublicensed outlets.

You shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deduction, set-offs or holdbacks whatsoever.

> b.      In addition to the reports required in the closed Circuit Television Standard Terms and Conditions, you shall provide Promoter with:

Separate reports no later than 72 hours, 48 hours, and 24 hours before the Event and one week following the Event, including the name, locations and license fee for each closed circuit exhibition outlet and including method of signal delivery to each outlet and the information required in Paragraph 10(d) of the Closed Circuit Television Standard Terms and Conditions.

Promoter's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to the Event and after the Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

> All contracts and reports shall be sent to:

Golden Boy Promotions
626 Wilshire Blvd., Suite 350
Los Angeles, CA 90017

12.     **Confidentiality.** Neither party shall disclose to any third party (other than its employees and agents, in their capacity as such, on a need-to-need basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event the party seeking disclosure shall so notify the other party as promptly as practicable (if possible, prior to making such a disclosure), (ii) as part of normal reporting or review procedure to its banks, auditors and attorneys and similar professionals, provided that such banks, auditors, attorneys and similar professionals agree to be bound by the provisions of this paragraph, and (iii) in order to enforce its rights pursuant to this Agreement.

13.     **Entire Agreement.** This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. It may not be altered, amended or discharged, except by a subsequent writing signed by the parties hereto. The laws of the State of Nevada applicable to contracts executed and to be fully performed in the State of Nevada shall govern this agreement, and execution of the agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of Nevada. Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be Las Vegas, Nevada. Judgment upon the award rendered by the arbitrator(s) may be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees. The prevailing party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration and attorneys' fees.

7

Very truly yours,

Golden Boy Promotions

By: _____ 9/16/17

Authorized Signature

Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Television License Agreement Shall not become effective unless and until Promoter has accepted and signed this Agreement and returned one copy to you.

ACCEPTED AND AGREED:

G&G Closed Circuit Events, LLC

By: _____

President

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE CLOSED CIRCUIT TELEVISON STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE CLOSED CIRCUIT TELEVISON STANDARD TERMS AND CONDITIONS.

8

# Exhibit A

COPYRIGHT ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT** is made this ___*16*___ day of ___*Sept.*___, 2017, (the "Effective Date") by and between Golden Boy Promotions, Inc., a California corporation, with its principal place of business located at 626 Wilshire Blvd #350, Los Angeles, CA 90017 (hereinafter "Golden Boy" or the "Assignor"), and G&G Closed Circuit Events, LLC a California corporation, with its principal place of business located at 950 South Bascom Avenue, Suite 3010, San Jose, California (hereinafter "G&G" or the "Assignee"), collectively, the "Parties".

**WHEREAS** Assignor is the copyright holder and owner of all proprietary interest in certain audiovisual works performed and transmitted or otherwise communicated, as specifically listed and detailed in Exhibit A (spreadsheet), attached hereto and made a part hereof, (hereinafter the "Work"), and WHEREAS Assignee is a licensor and distributor of programming including the audiovisual works of the type identified in Exhibit A.

**AND WHEREAS**, Assignor wishes to transfer its exclusive ownership and interest in the performance and transmission of the of the Work in commercial establishments (save for hotel guest rooms, in-flight aircraft or other transportation facilities) in the United States of America and Canada with a fire code occupancy capacity that does not exceed 500 persons (save for establishments within casinos where the seating capacity may exceed 500 persons), including the copyright and all other intellectual property rights in the performance and transmission of the of the Work in commercial establishments the United States of America and Canada to Assignee (hereinafter the "Commercial Work"), under the terms set forth in this Agreement;

**NOW THEREFORE**, in consideration of the mutual promises, covenants, warranties, and other good and valuable consideration, receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1. *Assignment.*  Assignor hereby irrevocably assigns to Assignee all rights, title and interest to the Commercial Work, including all copyright ownership and interest, and all moral rights associated with the creation of the Commercial Work and all other intellectual property associated with the Commercial Work. Assignee shall be the exclusive owner of the Commercial Work and of the copyright in the Commercial Work from the Effective Date forward, and shall have the exclusive right to secure registration of the copyright in the Commercial Work with the U.S. Copyright Office and the Canadian Intellectual Property Office. Assignee transfers all right, title and interest in any accrued or later accrued claims, causes of action, or lawsuits brought to enforce copyrights in the Commercial Work, appointing and permitting Assignor to prosecute said accrue or later accrued claims as if it were Assignee.

   No rights in the Commercial Work, or in the copyright in the Commercial Work, shall be retained by Assignor, nor shall there be any reversion of those rights to Assignor in the future.

2. *Assignor's Representations and Warranties.*  Assignor hereby represents and warrants the following:

   a.  Assignor has the legal authority to grant the Commercial Work, including all copyright rights and proprietary interest therein, as set forth in Section 1.  No other person or entity is required to consent to this assignment or to this Agreement for it to be valid and complete.

   b.  There are currently no licenses outstanding granting any other person or entity the right to enjoy or lay claim to any copyright rights or privileges in the Commercial Work. Assignor will not attempt to grant any such licenses at any time in the future.  To the best of Assignor's knowledge, the Commercial Work, and all copyright interest in the Commercial Work, is free and clear of any liens, security interests, or other encumbrances.

   c.  To the best of Assignor's knowledge, the Commercial Work does not infringe upon the rights, copyright or otherwise, of any other person or entity.

   d.  There are no claims currently pending or threatened, nor does Assignor have any reason to believe that any claims will be brought or threatened in the future, against Assignor's right, ownership or interest in the Commercial Work.

3. *Indemnification.*  Assignor agrees to indemnify and hold harmless Assignee for any claims, suits, damages, actions, or other costs arising out any breach of Assignor's warranties set forth in Section 3 above.

4. *Governing Law, Forum Selection, and Consent to Jurisdiction.*  This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of California, without regard to conflicts of law principles. The Parties agree that the exclusive jurisdiction and venue for the resolution of any dispute arising from or relating to this Agreement shall lie in the United States District Court, Central District of California, sitting in Los Angeles, California.

5. *Severability.*   In the event that any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect as if the unenforceable part or parts were. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

6. *Counterparts.*  This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

7. *Notice.*   Any notice required or otherwise given pursuant to this Agreement shall be in writing and delivered via any form of delivery that permits the sender to receive confirmation of delivery and receipt, including, 1) certified mail return receipt requested, postage prepaid, 2) delivery by overnight delivery service, 3) facsimile, or 4) email.

8. *Headings*.   The headings for section herein are for convenience only and shall not affect the meaning of the provisions of this Agreement.

9. *Entire Copyright Assignment Agreement; No Impact on Distribution Agreements*. This Agreement constitutes the entire Copyright Assignment agreement between Assignor and Assignee, and supersedes any prior understanding or representation with respect to Copyright Assignment of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement, i.e. Copyright Assignment. This Copyright Assignment Agreement is ancillary to and in no way impacts or contradicts or is intended to impact or contradict the rights and obligations of the parties hereto contained in any Closed Circuit Television License Agreement between the parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed the day and year first above written.

GOLDEN BOX PROMOTIONS, INC.

_____
Signature

Robert Gesparri
Print Name

COO
Title

9/16/17
Date

C&G Closed Circuit Events, LLC

_____
Signature

Nicholas J. Gaylord
Print Name

President
Title

9/16/17
Date

Copyright Assignment Agreement - 3 of 4

*Saul "Canelo" Alvarez v. Gennady Golovkin Championship Fight Program*

**Type of Work:** Motion Picture
**Registration Number / Date:** TBA / 2017-09-16
**Application Title:** Saul "Canelo" Alvarez v. Gennady Golovkin featured boxing match with accompanying undercard programming, September 16, 2017.

**Title:** Saul "Canelo" Alvarez v. Gennady Golovkin featured boxing match with accompanying undercard programming, September 16, 2017.

**Description:** TBA videodiscs
**Copyright Claimant:** Golden Boy Promotions, LLC Address: 626 Wilshire Blvd, Suite 350, Los Angeles, CA 90017.
**Date of Creation:** 2017
**Date of Publication:** 2017-09-16
**Nation of First Publication:** United States
**Authorship on Application:** Golden Boy Promotions, LLC, a California limited liability corporation, employer for hire; Domicile: United States; Citizenship: United States. Authorship: Production of television program.

**Names:** Golden Boy Promotions, LLC